## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MICHAEL R. MCNAUL** : | |
| Plaintiff : | |
| : | |
| v. : | **CIVIL ACTION NO. 5:09-cv-01741-JKG** |
| : | |
| **SALISBURY BEHAVIORAL HEALTH,** : | |
| **INC. d/b/a MILESTONES COMMUNITY** : | |
| **HEALTHCARE, INC.** : | |
| Defendant : | |

## ORDER

**AND NOW**, this _____ day of _____, 2010, upon consideration of

Defendant's Motion for Summary Judgment, Plaintiff's response thereto, and any oral argument

it is hereby **ORDERED** that Defendant's Motion is **DENIED**.

## BY THE COURT:

_____

James Knoll Gardner, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL R. MCNAUL** | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | **CIVIL ACTION NO. 5:09-cv-01741-JKG** |
| **SALISBURY BEHAVIORAL HEALTH,** | : | |
| **INC. d/b/a MILESTONES COMMUNITY** | : | |
| **HEALTHCARE, INC.** | : | |
| Defendant | : | |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Plaintiff, Michael R. McNaul (McNaul), through his attorney, Scott M. Pollins, opposes

Defendant's Motion for Summary Judgment.  McNaul incorporates by reference the attached

Brief and Response to Facts Defendant Claims are Undisputed and Material as if fully set forth.

McNaul respectfully requests that this Honorable Court deny Defendant's Motion.


Respectfully submitted,


By: _____SMP2861_____
Scott M. Pollins (Pa. Atty. Id. No. 76334)
108 Springton Mews Circle
Media, PA 19063-1070
(610) 896-9909 (phone)/(610) 896-9910 (fax)
scott@pollinslaw.com (email)

Date:  4/12/10 _____        Attorney for Plaintiff, Michael R. McNaul

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL R. MCNAUL** | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | **CIVIL ACTION NO. 5:09-cv-01741-JKG** |
| **SALISBURY BEHAVIORAL HEALTH,** | : | |
| **INC. d/b/a MILESTONES COMMUNITY** | : | |
| **HEALTHCARE, INC.** | : | |
| Defendant | : | |

### PLAINTIFF'S RESPONSE TO FACTS DEFENDANT
### CLAIMS ARE UNDISPUTED AND MATERIAL

In accordance with the Court's Order entered November 10, 2009, Plaintiff, Michael R.

McNaul (McNaul), by his attorney, Scott M. Pollins, responds to Defendant's Statement of

Undisputed Facts in accordance with the numbering thereof.

Defendant, Salisbury Behavioral Health, Inc. d/b/a Milestones Community Healthcare,

Inc. (MCH) has failed to present all of the relevant undisputed facts. Accordingly, McNaul has

included additional facts in his Brief in Opposition to Defendant's Motion for Summary

Judgment.

### Introduction

1-7. Admitted.

### McNaul's Alleged Performance Issues

8. Denied as stated. McNaul admits that he spoke with Jodi Dill (Dill) in early 2005

about spending more time in the Harrisburg office. McNaul told Dill that between the fraud

investigation he was working on and the additional responsibilities he had taken on he could not

guarantee he could be there two days every week and Dill responded 'do your best'. McNaul's

deposition transcript attached as **Exhibit 1** at pp. 29-30.

Pam Grau's (Grau) anecdotal note for February 22, 2005 is referenced by MCH as Exhibit 1 to Grau's deposition transcript. Grau did not share her anecdotal notes with anyone, including McNaul; the anecdotal notes were simply her tool. Grau's deposition transcript attached as **Exhibit 2** at pp. 82-83. To the extent that MCH claims that information contained in Grau's anecdotal notes are evidence of undisputed material facts and McNaul disagrees, the Court should not consider this information as undisputed.

When evaluating a summary judgment motion in an employment discrimination case, a court should give no weight to even uncontradicted testimony of an interested witness where that testimony supports the moving party. The Supreme Court cautioned that the role of the jury must be preserved with respect to the determination of credibility, the weighing of evidence, and the drawing of legitimate inferences from the facts:

> Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.

Reeves v. Sanderson Plumbing, 530 U.S. 133, 151 (2000).

9. Admitted.

10. Denied as stated. McNaul admits that in early June 2006 Dill emailed Grau about issues she had about McNaul's performance. McNaul denies that Grau considered the issues that Dill had with McNaul in early 2006 to be problems. In her June 2, 2006 email to Dill, Grau stated that she had mixed feelings about making their meeting with McNaul a procedural review because they had never formally counseled him. Grau felt that an alternative to Dill's recommendation that McNaul be issued a procedural review was to lay the issues out in a serious tone with the understanding that they will revisit the issues in 30 days; if he did not improve in

2

30 days then they would issue him a procedural review.  Early 2006 exchange of emails between

Grau and Dill attached as **Exhibit 3**.

      11.  Admitted that Dill mentioned oversight of chart audits in her June 1, 2006 email to

Grau, attached as part of **Exhibit 3**.

      12.  Denied.  McNaul did a preliminary review of the charts and he spoke with Nichole

Arnold (Arnold).  She said don't worry about it, she was going to have the program coordinators

go through the charts.  When the auditors subsequently showed up, there were things missing

and he was blamed for that.  McNaul does not believe that Arnold told Dill that the program

coordinators were assigned to review the charts after McNaul and they did not do that.  **Exhibit 1**

at pp. 33-35.

      13.  Admitted.

      14.  Admitted.  By way of further response,

A procedure review is designed to help employees improve their performance by
providing feedback and an opportunity to discuss problems as they occur from time to
time.  While a procedure review may lead to disciplinary action if the same or a similar
problem re-occurs, procedure reviews are not punitive in nature and generally are
resolved with no negative reflection on the employee.

MCH's Employee Handbook attached as **Exhibit 4** at p. 900-12.

      15.  Admitted.

      16.  Admitted.  By way of further response, Dill cut McNaul off when he tried to speak in

the procedure review meeting.  Dill did not allow McNaul to respond.  Prior to Dill issuing

McNaul the procedure review, he had been talking with her about increasing pain, stinging and

burning he was feeling in the pinky and ring fingers of both of his hands.  **Exhibit 1** at p. 25.

After the procedure review, Grau called McNaul and told him that she did not know what was

going on with Dill in Harrisburg.  **Exhibit 2** at p. 95.

17. Admitted that Grau testified to that in her deposition but denied this is an undisputed material fact. Grau is an interested witness offering testimony supporting MCH as the moving party and pursuant to <u>Reeves,</u> the Court should not consider this in reviewing a summary judgment motion. McNaul refers to ¶8 above in which we propose how the Court should view the information contained in Grau's anecdotal notes. Additionally, Grau stated that McNaul was never disciplined for anything during the time he worked for her and she had ongoing communication with him. **Exhibit 2** at p. 81.

18-23. McNaul incorporates his response to ¶17 as if fully set forth herein.

24. Admitted.

25. Denied as stated. McNaul admits that Grau spoke with him about using the Harrisburg office staff's assistance with sending out satisfaction surveys. Other than that instance and where he requested assistance with data entry, McNaul did not request any other assistance from the Harrisburg staff. **Exhibit 1** at p. 130.

26. McNaul incorporates his response to ¶17 as if fully set forth herein.

27. Admitted that Dill stated that in an email to Grau, however it is denied that this is an undisputed material fact.

28. Admitted that Dill stated that in an email to Grau, however it is denied that this is an undisputed material fact. By way of further response, Grau does not know what was next in response to Dill's question to her in the September 13, 2006 email. **Exhibit 2** at pp. 113-14.

29. Denied. McNaul prepared several graphs and he noticed some errors with the data entry. The problem was that the clinicians who provided him with the data may have inaccurately entered the data on a cover sheet. At a meeting in October 2006 where McNaul

presented the reports he told Dill and others to look at the format of the reports and not the

contents because he knew the contents contained errors. **Exhibit 1** at pp. 46-48.

30. McNaul incorporates his response to ¶17 as if fully set forth herein.

31-32. Admitted.

33. Denied. McNaul claims he was terminated due to disability discrimination, not

performance issues. McNaul believes that there was a concern or fear that he would become

more and more disabled and they would have to provide him with accommodations and they

were fearful of that. He believes Dill had that fear based on how he treated her. When he first

heard and then reported to Dill that he might have multiple sclerosis (MS), he believes that Dill

became concerned with what that would mean in the future to the organization regarding

accommodations to McNaul. **Exhibit 1** at pp. 92-94.

### McNaul's Medical Issues

34-36. Admitted.

37. Admitted. By way of further response, the burning pain McNaul felt in his pinky and

ring fingers started hurting more and more. **Exhibit 1** at p. 57.

38-43. Admitted.

44. Admitted. McNaul initially scheduled the spinal tap and cancelled it because he and

his wife were getting their daughter ready for her second year at Penn State and he decided to

postpone the spinal tap. McNaul was in a little bit of denial and did not want to hear what the

results of the spinal tap might be. **Exhibit 1** at p. 60.

45. Admitted.

46. Denied as stated. According to McNaul's long term disability insurer, Unum

Provident (Unum), he met the definition of disability as contained in Unum's long term disability

insurance policy. January 7, 2008 letter from Unum to MCH attached as **Exhibit 5**. The

definition of disability contained in Unum's long term disability insurance policy is different

than the definition of disability in the Americans with Disabilities Act (ADA) and the

Pennsylvania Human Relations Act (PHRA).

By way of further response, had he not been fired, McNaul believes he could have

worked for another two years or so with the proper accommodation. **Exhibit 1** at p. 128.

47. Admitted with clarification (therefore not an undisputed material fact as stated). By

way of clarification, McNaul stated that the stress of job elimination, MS diagnosis and nerve

pain led to <u>major</u> depression (emphasis added). The interferon medication was not necessarily a

precursor. **Exhibit 1** at pp. 84-85.

48. Admitted. By way of further response, losing his job was a major contributing factor

to McNaul's major depression and subsequent hospitalizations. Having MS and dealing with

nerve pain did not make him entertain the possibility of pulling his daughter out of college,

losing their cars, and losing their house. He does not believe that that MS and nerve pain by

themselves contributed to the kind of depression he had. If he was not fired and had time to

adjust to the MS and he had some accommodations, he believes he could have continued to work

for some time. He might still be working. **Exhibit 1** at pp. 118-122.

49. Admitted. This is not an undisputed material fact. The ADA and PHRA do not

apply to individuals who are <u>unable</u> to perform any of their job duties; the disability

discrimination laws were enacted to protect individuals who are <u>substantially limited</u> in

performing their duties with or without reasonable accommodation.

50. Admitted. See response to ¶49.

51. Denied.  McNaul admits that no one at MCH treated him like he was disabled to him directly.  However, he does believe there was a concern or fear that he would become more and more disabled and that MCH would have to provide accommodation and they were fearful of that.  **Exhibit 1** at pp. 90-92.

52. Denied.  In the last two months he was employed at MCH, he spoke with Charisse Steffy (Steffy) about voice recognition systems.  He told her he needed this to do his job with some comfort.  She told him that she knew of a couple of systems, she would look at them and they will get back together and talk.  He asked her if he should have his neurologist write something and she said yes.  **Exhibit 1** at pp. 65-66, 69.

53. Denied.  See response to ¶52.

54. Denied.  This is not an undisputed material fact.  The ADA and PHRA do not require that McNaul know of the precise accommodation that will work for his condition.
An employee is generally not required to request the specific accommodation that he or she ultimately seeks. Armstrong v. Burdette Tomlin Memorial Hosp., 438 F.3d 240, 246-248 (3rd ir. 2006); Velente-Hook v. Eastern Plumas Health Care, 368 F. Supp. 2d 1084, 1093-1094 (E.D. Cal. 2005); Medlin v. Rome Strip Steel Co., Inc., 294 F. Supp. 2d 279, 291-292 (N.D.N.Y. 2003).  In fact, the employee does not have to specify a precise accommodation at all. EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, Question 5 (EEOC October 2002, Revised), **http://www.eeoc.gov/policy/docs/accommodation.html**. Questions and Answers about Health Care Workers and the Americans with Disabilities Act, Question 4 (EEOC Feb. 26, 2007), **http://eeoc.gov/facts/health&care&workers.html**. Nor is it fatal that the employee initially requested an accommodation that the employer could not provide. Taylor v. Phoenixville School

7

Dist., 184 F.3d 296, 315 (3rd Cir. 1999).  Even an ambiguous request as to the precise nature of

the disability or accommodation, if sufficient to notify the employer that the employee may have

a disability that requires accommodation, requires the employer to ask for clarification. EEOC v.

Sears, Roebuck & Co., 417 F.3d 789, 804 (7th Cir. 2005) (an employer cannot shield itself from

liability by choosing not to follow up on an employee's request for assistance, or by intentionally

remaining in the dark.). "I want to keep working for you-do you have any suggestions?", was

found sufficient to trigger the employer's duty to enter into the interactive process. Miller v.

Illinois Dep't of Corrections, 107 F.3d 483, 486-487 (7th Cir. 1997).

    55.  Admitted.  This is not an undisputed material fact.  See response to ¶49.

    56.  Admitted.


                         Respectfully submitted,

By:          SMP2861
              Scott M. Pollins (Pa. Atty. Id. No. 76334)
              108 Springton Mews Circle
              Media, PA 19063-1070
              (610) 896-9909 (phone)
              (610) 896-9910 (fax)
              scott@pollinslaw.com (email)

Date:  4/12/10                Attorney for Plaintiff, Michael R. McNaul

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL R. MCNAUL** | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | **CIVIL ACTION NO. 5:09-cv-01741-JKG** |
| **SALISBURY BEHAVIORAL HEALTH,** | : | |
| **INC. d/b/a MILESTONES COMMUNITY** | : | |
| **HEALTHCARE, INC.** | : | |
| Defendant | : | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to F.R.Civ.P. 56, Plaintiff, Michael R. McNaul (McNaul), through his attorney, Scott M. Pollins, submits this Brief in Opposition to Defendant's Motion for Summary Judgment. Defendant, Salisbury Behavioral Health, Inc. d/b/a Milestones Community Healthcare, Inc., will be hereinafter referred to as MCH.

## I.   INTRODUCTION and PROCEDURAL HISTORY

McNaul worked as a performance improvement coordinator for MCH from March 2003 through October 2006 when he was fired. Beginning in early 2006, McNaul begins to experience severe pain in his fingers. He seeks medical care and undergoes a number of medical tests over the next 9-10 months to diagnose his condition. He keeps his supervisors verbally informed of his finger pain, doctor visits and medical tests.

Several months before he is fired, McNaul tells his supervisors that he might have multiple sclerosis (MS). He then notices a palpable change in behavior by one of his supervisors, and she is responsible for firing him several months later. Toward the end of his employment, McNaul speaks with the office manager about voice recognition software to help him with his job, however the discussion never progresses beyond that one occasion.

Approximately one year ago, McNaul filed this lawsuit against MCH. McNaul claims that MCH fired him due to disability discrimination and that MCH failed to offer him reasonable accommodations. MCH subsequently filed a motion for summary judgment in which it claims that it fired McNaul for legitimate non-discriminatory reasons and that he never requested any accommodations. MCH also claims that statements McNaul made in applying for long term disability insurance and social security disability should limit his claim for back pay and eliminate his claim for front pay at trial.

## II.   **MCNAUL'S STATEMENT OF MATERIAL FACTS**

McNaul incorporates by reference his Response to Facts MCH Claims are Undisputed and Material. He also offers the additional material facts for the Court to consider.

### A. **McNaul's initial employment at MCH**

McNaul started working as a consultant for MCH in 2002. **Exhibit 1** at p. 12. He previously worked with Jodi Dill (Dill), who was one of his supervisors at MCH, at a prior employer. **Id.** at pp. 9-10. McNaul started working as an employee of MCH in March 2003 when he became a performance improvement coordinator (PIC). **Id.** at p. 13. He was the PIC for MCH's Reading and Harrisburg offices. **Exhibit 2** at p. 68. No other PIC had responsibilities for more than one region. **Id.** at p. 42. When he received a written job description in November 2004, his job duties expanded to include tracking children's outcomes over time and more data collection and entry. **Exhibit 1** at pp. 16-18. In April 2006, McNaul attended training to become a fraud investigator for MCH. **Id.** at p. 23.

### B. **MCH's progressive discipline policy**

MCH has a progressive discipline policy. **Exhibit 2** at p. 27; Charisse Steffy's (Steffy) deposition attached as **Exhibit 6** at pp. 30-31 (Steffy is the Reading office manager and she has

HR functions in Reading, including collaborating with managers on employee performance issues – **Exhibit 6** at pp. 14, 38); and Dill's deposition attached as **Exhibit 7** at p. 26.  Managers have discretion on how to use MCH's progressive discipline policy.  **Exhibit 2** at pp. 31-32.  Progressive discipline means several steps may be taken prior to firing an employee.  **Exhibit 7** at p. 27.  The steps are procedure review, disciplinary action and termination.  **Id.**  A disciplinary action is more serious than a procedure review.  **Id.** at pp. 27-28.

### C.  June 2006 – Dill issues McNaul a procedure review

On June 21, 2006, McNaul receives a procedure review from Dill.  Procedure review attached as **Exhibit 8** and **Exhibit 2** at p. 95.  Grau has mixed feelings about giving McNaul a procedure review because they had never formally counseled him.  Grau's June 2, 2006 email to Dill attached as **Exhibit 9**.  Grau feels that instead of giving McNaul a procedure review they could lay out the issues in a serious tone with the understanding that they will revisit the issues in 30 days.  **Id.**  Grau tells Dill she would rather go with her recommended route but if Dill feels strongly about the procedure review she will agree.  **Id.**

McNaul does not feel that the procedure review is justified.  **Exhibit 2** at p. 95.  During her employment at MCH, Steffy received two procedure reviews from Dill.  **Exhibit 6** at pp. 24-25.  According to Steffy, anyone who receives a procedure review is not going to believe they should have received it and is going to disagree with it.  **Id.** at pp. 25-26.  After the procedure review, McNaul is not disciplined prior to MCH firing him.  **Exhibit 7** at 122; **Exhibit 2** at 81.

### D.  McNaul shares his medical issues with Dill, Grau and Steffy

During the time McNaul worked at MCH, he makes Grau and Dill aware of medical issues he is having.  **Exhibit 2** at pp. 56-57; **Exhibit 7** at p. 87.  McNaul complains about low back issues, neurological symptoms and his investigating whether he has MS.  **Exhibit 2** at p. 57.

Grau believes McNaul may have shared this information with Dill and Steffy.  **Id.**  Grau tells him if it turns about to be MS, she knows of doctors in Philadelphia she could set him up with.  **Exhibit 1** at p. 41.

McNaul tells Dill that he has tingling in his arms and hands and this is an issue for him.  **Exhibit 7** at p. 88.  McNaul tells Dill he is going for medical testing to find out what that is about.  **Id.**  Grau speaks with Dill about medical issues McNaul is having.  **Exhibit 2** at p. 61.  When they start to have concerns about his performance, they discuss whether there are medical issues relative to that.  **Id.**

At least two weeks before McNaul is terminated, he tells Dill, Grau and Steffy that he is having a spinal tap to either rule out or verify MS.  **Exhibit 1** at pp. 60-61.  On the morning of October 23, 2006, the day he is terminated, McNaul emails Dill and Grau to notify them that he is having a medical test (spinal tap) and he will be out all day.  October 23, 2006 email from McNaul attached as **Exhibit 10**.

### E.  McNaul's requests for accommodations

McNaul requests and is granted a split keyboard.  **Exhibit 1** at 65.  In the last two months of his employment, McNaul speaks with Steffy about a voice recognition system.  **Id.**  Steffy is aware by this time that McNaul is having pain in his fingers, wrist, neck and back and that he is in a lot of pain.  **Exhibit 6** at p. 59.  McNaul tells Steffy he is slower on data entry.  **Id.** at p. 60.

McNaul tells Steffy he needs the voice recognition software to do his job with some comfort.  **Exhibit 1** at p. 69.  She tells him that she knows of a couple of systems, she will look at them and they will get back together and talk.  **Id.** at pp. 65, 69.  He asks her if he should have his neurologist write something and she says yes he might want to get something in writing but it

is not like he has to. **Id.** at pp. 66, 70.  Steffy knows McNaul's neurologist because her husband

uses Dr. Brzozowski also. **Id.** at p. 59.

**F.  Grau's late Sept. 2006 'plan' and 'draft' performance evaluation for McNaul**

On September 26, 2006, Grau sends an email with the subject line 'The Plan' to Dill in

which she states that she wants to explore the possibility of having two people cover the

performance improvement duties in Harrisburg.  September 26, 2006 email sent by Grau at 8:24

a.m. attached as **Exhibit 11**.  Grau states that it is perhaps not reasonable to have one person

(McNaul) covering seven sites.  **Id.**  Grau's plan is to move McNaul on a short term basis into a

strictly performance improvement role.  **Id.**  Dill does not recall receiving this email from Grau,

she does not recall if she sent an email or contacted Grau about whether she agreed with Grau's

plan for McNaul and she does not know if McNaul was moved into a strictly performance

improvement position for his last month of employment, however she disagrees with Grau about

it being unreasonable to have one performance improvement coordinator (McNaul) cover seven

sites.  **Exhibit 7** at pp. 144-47.  Grau recalls that Dill does not agree with her plan.  **Exhibit 2** at

p. 132.

Later on September 26, 2006, Grau emails Dill McNaul's performance evaluation that

they are going to review with him the next day.  Grau's September 26, 2006 email sent to Dill at

3:40 p.m. along with the six page evaluation attached as **Exhibit 12**.  In Grau's evaluation, she

rates McNaul a '3' (on a scale of 1 to 5 with 5 being the highest rating) for his analytical skills

and a '4' for his attendance/dependability/punctuality.  **Id.** (see pages 3 and 4 of attached draft

evaluation).  In the comments section, Grau states that it is her recommendation that McNaul be

placed on a three month probation pending resolution of ongoing issues and goals with further

evaluation taking place after three months.  **Id.** (see page 5 of attached draft evaluation).

Grau is trying to find a way not to terminate McNaul. **Exhibit 2** at pp. 130-31. Although Dill apparently receives Grau's email and draft evaluation for McNaul, she claims that no one suggested that McNaul be placed on probation instead of being fired. **Exhibit 7** at p. 113.

### G. McNaul has employer ordered physical less than one week before he is fired

On October 18, 2006, MCH receives a Communicable Disease Clearance Form for McNaul indicating that he does not have clinical evidence of any communicable disease and he does not present a serious threat to the health and safety of others. Communicable Disease Clearance Form attached as **Exhibit 13**. On the same day, Dr. Jerry Thompson prepares an Employee Physical Examination Record for McNaul. Employee Physical Examination Record attached as **Exhibit 14**.

Steffy, the Reading office's HIPAA privacy officer, believes that the above forms are prepared for McNaul because her reminder system prompted her that it has been two years since McNaul last had a physical exam. **Exhibit 6** at pp. 17, 89. When Steffy sees that McNaul last had a physical in April 2003, over 3 ½ years ago, she cannot explain why McNaul did not have another physical until October 2006 except to say that she got behind on notifying employees. **Id.** at p. 90; Staff Profile Form showing that McNaul's prior physical exam was done on April 17, 2003 attached as **Exhibit 15**.

### H. McNaul is fired on October 23, 2006

On October 23, 2006, McNaul receives his performance evaluation and is told by Grau that he is being fired for cause. Grau's October 23, 2006 Anecdotal Note attached as **Exhibit 16**. In the evaluation McNaul receives on the day he is fired, he receives a '2' rating for his analytical skills and a '3' rating for his attendance/dependability/punctuality. McNaul's final

6

performance evaluation attached as **Exhibit 17**. Additionally, in the comments section at the end, the evaluation does not state that McNaul is being placed on a three month probation. **Id.**

Grau says that Dill was not present when she fired McNaul because Dill had personal relationships with McNaul and some common friendships and she felt it would placed her in a difficult place with those relationships so she asked Grau not to be there. **Exhibit 2** at p. 134. Dills says she was not there to fire McNaul because Grau said she could do it herself. **Exhibit 7** at pp. 109-10.

Steffy writes in an employer's unemployment compensation form on November 3, 2006 that McNaul was laid off and his position no longer exists. Employer's Notice of Application attached as **Exhibit 18**. Grau told her what to write. **Exhibit 6** at pp. 73-74. Several weeks later Steffy receives a letter from McNaul's neurologist stating that his spinal tap unfortunately confirmed that he has MS. November 15, 2006 letter from Lawrence A. Brzozowski, M.D. to Steffy attached as **Exhibit 19**. Steffy has no record of who she gave this letter to and she has no way of telling what happened to this letter. **Exhibit 6** at p. 83.

## III.   **LEGAL ARGUMENT**

### A.   **Summary Judgment standard**

Summary judgment should be granted only where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). In making its determination, a court should view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor. Reeves v. Sanderson Plumbing, 530 U.S. 133, 150 (2000); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court must disregard all evidence favorable to the moving party that the jury is not required to believe. Reeves, 530 U.S. at 151. These requirements are to be applied with added

rigor in employment discrimination cases, where intent and credibility are crucial issues. Stewart v. Rutgers University, 120 F.3d 426, 431 (3rd Cir. 1997). The court may not weigh the evidence or make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3rd Cir.1998).

If the non-moving party has met the extraordinarily low burden of evidence and offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F. 2d 1358, 1363 (3rd Cir. 1992); Dasilva v. Cambridge Lee Industries, LLC, 2008 Westlaw 4889018, at *2 (E.D.Pa. 11/12/08). A plaintiff does not have to prove at the summary judgment stage that the employer's purported reasons for its actions were false; the plaintiff need only to introduce evidence sufficient to raise a doubt as to whether they were the true reasons. Nowosad v. Villanova Univ., 1999 Westlaw 322486, at *5 (E.D. Pa. 5/19/99).

"This Court has noted that proving discriminatory intent "is both sensitive and difficult" and has recognized that "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711, 716 (1983). Accord, Hunt v. Cromartie, 526 U.S. 541, 119 S.Ct. 1545 (1999). "Cases charging discrimination are uniquely difficult to prove and often depend upon circumstantial evidence.... [D]irect evidence of an employer's motivation will often be unavailable or difficult to acquire." Sheridan v. E.I. du Pont de Nemours and Co., 100 F.3d 1061, 1071 (3rd Cir. 1996), cert. denied, 521 U.S. 1129 (1997).

Circumstantial evidence can sometimes be more reliable than direct evidence. "We better know there is a fire whence we see much smoke rising than we could know it by one or

two witnesses swearing to it.  The witnesses may commit perjury, but the smoke cannot."

Hopkins v. Andaya, 958 F.2d 881, 888 (10th Cir. 1992)(quoting Abraham Lincoln).

Defendant's motion for summary judgment is an attempt to deprive McNaul of his right

to a jury trial.  Such motions should be closely scrutinized, because of their potential to

undermine the role of a jury of ordinary citizens, which lies at the heart of our judicial system.

As then-Justice Rehnquist stated:

> Jurors bring to a cause their common sense and community values; their "very
> inexperience is an asset because it secures a fresh perception of each trial, avoid the
> stereotypes said to infect the judicial eye."

Parklane Hosiery Co. v. Shore, 439 U.S. 322, 355, (1979)(dissenting opinion), quoting H.

Kalven & H. Zeisel, The American Jury 8 (1966).

"Summary judgment is to be used sparingly in employment discrimination cases."  Doe

v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 369 (3rd Cir. 2008).

Whether the employer tried to accommodate the plaintiff's disability, and whether the

plaintiff cooperated in that process, "are classic fact questions for the jury to resolve."  Lenker v.

Methodist Hosp., 210 F.3d 792, 797 (7th Cir. 2000).

## B.     McNaul has established a prima facie case of regarded as disability discrimination

McNaul is not pursuing a claim for disability discrimination based on actual disability or

record of disability.  Instead, McNaul claims that MCH regarded him as disabled.  A person is

"regarded as" having a disability if he (1) has a physical or mental impairment that does not

substantially limit major life activities but is treated by his employer as having such a limitation;

(2) has a physical or mental impairment that substantially limits major life activities only as a

result of the attitudes of others toward such impairment; or (3) has no such impairment but is

treated by his employer as having a substantially limiting impairment. Eshelman v. Agere

Systems, Inc., 554 F.3d 426, 434 (3rd Cir. 2009).  "[W]hen an employee asserts ... that he was

regarded as disabled, the analysis 'focuses on the reactions and perceptions of the [employer's]

decisionmakers' who worked with the employee."  Wilson v. Phoenix Specialty Mfg., Co., 513

F.3d 378, 385 (4th Circ. 2008); Pinegar v. Shinseki, 665 F.Supp. 2d 487 (M.D. Pa. 2009).

In the Appendix to Part 1630, the EEOC elaborated on the background of the "regarded

as" language:

> The rationale for the "regarded as" part of the definition of disability was articulated by
> the Supreme Court in the context of the Rehabilitation Act of 1973 in School Board of
> Nassau County v. Arline, 480 U.S. 273 (1987).  The Court noted that, although an
> individual may have an impairment that does not in fact substantially limit a major life
> activity, the reaction of others may prove just as disabling.  "Such an impairment might
> not diminish a person's physical or mental capabilities, but could nevertheless
> substantially limit that person's ability to work as a result of the negative reactions of
> others to the impairment."  Arline, 480 U.S. at 283.  The Court concluded that by
> including "regarded as" in the Rehabilitation Act's definition, "Congress acknowledged
> that society's accumulated myths and fears about disability and disease are as
> handicapping as are the physical limitations that flow from actual impairment."  Arline,
> 480 U.S. at 284.
>
> An individual rejected from a job because of the "myths, fears and stereotypes"
> associated with disabilities would be covered under this part of the definition of
> disability, whether or not the employer's or other covered entity's perception were shared
> by others in the field and whether or not the individual's actual physical or mental
> condition would be considered a disability under the first or second part of this definition.
> As the legislative history notes, sociologists have identified common attitudinal barriers
> that frequently result in employers excluding individuals with disabilities. These include
> concerns regarding productivity, safety, insurance, liability, attendance, cost of
> accommodation and accessibility, workers' compensation costs, and acceptance by
> coworkers and customers.
>
> Therefore, if an individual can show that an employer or other covered entity made an
> employment decision because of a perception of disability based on "myth, fear or
> stereotype," the individual will satisfy the "regarded as" part of the definition of
> disability. If the employer cannot articulate a non-discriminatory reason for the
> employment action, an inference that the employer is acting on the basis of "myth, fear or
> stereotype" can be drawn.
>
> 29 C.F.R. pt. 1630 app.; quoted in Lizotte v. Dacotah Bank, 2010 Westlaw 45555, at *5-6
> (D.N.D. 1/7/10).

"Even an innocent misrepresentation based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." Deane v. Pocono Medical Center, 142 F.3d 138, 144 (3rd Cir. 1998), citing 29 C.F.R. § 1630.2(i).

McNaul has presented sufficient evidence at this stage to show that Dill and MCH improperly regarded him as disabled. Summary judgment is generally inappropriate in employment discrimination cases because people's intentions and perceptions are the key evidence that a jury will look at to determine whether there was illegal discrimination. People's intentions and perceptions are rarely something that can be resolved as a matter of law and are best left for a jury to decipher.

Here, McNaul has presented the following evidence that a jury could believe shows Dill and MCH perceived McNaul was disabled: Dill's attitude toward McNaul changed once she knew that he might have MS; he was never disciplined prior to disclosing he might have MS and once he made that disclosure Dill had him fired within several months; one of McNaul's supervisors, Grau, did not believe he should have received the procedure review nor that he should have been terminated yet Dill insisted on both; McNaul was taking on more and more responsibilities yet Dill thought he was not doing enough and was performing poorly on what he was doing; MCH failed to follow its progressive discipline policy in firing McNaul and offered no believable explanation for why McNaul was summarily terminated after receiving a procedure review and no disciplinary action; Dill ignored or does not recall Grau's efforts to keep McNaul employed; MCH failed to reasonably accommodate and engage in any meaningful interactive process with McNaul when he raised the possibility of using voice recognition software less than one month before he was fired; McNaul was inexplicably requested to

11

undergo a physical exam 3 ½ years after his initial physical exam and less than one week before

he is fired; and McNaul was fired two days before his supervisors knew he was having a test that

would definitively tell him whether he had MS or not.

### C.     The circumstances of McNaul's termination show pretext

Plaintiffs can demonstrate intent by showing that their termination represented a

departure from established corporate policy or practice. Arlington Heights v. Metropolitan

Development Housing Corp., 429 U.S. 252, 267 (1977); Stewart v. Rutgers, The State

University, 120 F.3d 426, 433-434 (3rd Cir. 1997).  An employer's failure to follow its own

procedures is relevant to a showing of pretext.  Blow v. City of San Antonio, Texas, 236

F.3d 293 (5th Cir. 2001); Futrell v. J.I. Case, 38 F.3d 342, 349 (7th Cir. 1994); Lindsey v. Prive

Corp., 987 F.2d 324, 328 (5th Cir. 1993) (failure to follow progressive discipline policy evidence

of improper motive); Briscoe v. Fred's Dollar Store, Inc., 24 F.3d 1026, 1028 (8th Cir. 1994)

(similar holding).  If the employer is defending on the basis of poor performance, the plaintiff

may defeat summary judgment by challenging the proffered reason as insufficiently documented,

and inconsistent with the views of others.  Hugh v. Butler County Family YMCA, 418 F.3d 265,

269 (3rd Cir. 2005) (no prior complaints or counseling as called for in Employee Handbook

regarding proffered performance reason is evidence of pretext).

### D.     MCH failed to reasonably accommodate McNaul

Employees who are 'regarded as disabled' are entitled to reasonable accommodations.

Williams v. Philadelphia Housing Authority Police Department, 380 F.3d 751 (3rd Cir. 2004).  In

Taylor v. Phoenixville School District, 184 F.3d 296 (3rd Cir. 1999), the court stated as follows:

> In short, an employer who has received proper notice cannot escape its duty to engage in
> the interactive process simply because the employee did not come forward with a
> reasonable accommodation that would prevail in litigation. Participation is the obligation
> of both parties, however, so an employer cannot be faulted if after conferring with the

employee to find possible accommodations, the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals. And while a specific request may not always be necessary to initiate the process, it certainly helps bolster the employee's claim that the employer knew that the employee wanted accommodations.

Taylor, 184 F.3d at 317.

An employee does not need to precisely articulate his request as an 'accommodation' as long as he communicates a need for what would amount to an accommodation. Boice v. SEPTA, 2007 Westlaw 2916188 at *13 (E.D. Pa. 10/5/07). An employee is generally not required to request the specific accommodation that he or she ultimately seeks. Armstrong v. Burdette Tomlin Memorial Hosp., 438 F.3d 240, 246-248 (3rd Cir. 2006). In fact, the employee does not have to specify a precise accommodation at all. EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, Question 5 (EEOC October 2002, Revised), http://www.eeoc.gov/policy/docs/accommodation.html. Questions and Answers about Health Care Workers and the Americans with Disabilities Act, Question 4 (EEOC Feb. 26, 2007), http://eeoc.gov/facts/health&care&workers.html.

Nor is it fatal that the employee initially requested an accommodation that the employer could not provide. Taylor, 184 F.3d at 315. Even an ambiguous request as to the precise nature of the disability or accommodation, if sufficient to notify the employer that the employee may have a disability that requires accommodation, requires the employer to ask for clarification. EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 804 (7th Cir. 2005) (an employer cannot shield itself from liability by choosing not to follow up on an employee's request for assistance, or by intentionally remaining in the dark.). "I want to keep working for you-do you have any suggestions?", was found sufficient to trigger the employer's duty to enter into the interactive

13

process. <u>Miller v. Illinois Dep't of Corrections</u>, 107 F.3d 483, 486-487 (7th Cir. 1997).

An employer has a duty to reasonably accommodate an employee's disability where the disability is obvious even though the employee did not request an accommodation. <u>Brady v. Wal-Mart Stores, Inc.</u>, 531 F.3d 127 (2nd Cir. 2008). An employer must take action "if the employer knew or reasonably should have known that the employee was disabled." <u>Brady</u>, 531 F.3d at 135.

In <u>Cannice v. Norwest Bank Iowa</u>, the Eighth Circuit looked to the employer's preexisting knowledge of the plaintiff's mental or physical condition as supplemental information concerning the plaintiff's limitations and need for an accommodation. The court listed various instances in which the plaintiff's depression exhibited itself in the work place as a source of information concerning plaintiff's condition and need for an accommodation. <u>Cannice v. Norwest Bank Iowa</u>, 189 F.3d 723 at 727 (8th Cir. 1999).

Less than a month before McNaul was fired, he spoke with Steffy about the possibility of him using voice recognition software to assist him. While McNaul may not have said he was requesting an accommodation, he provided enough information that the discussion should have progressed farther before he was fired.

### E.  McNaul's claim for back pay after January 23, 2007 and front pay should be decided by a jury

MCH bases its claim that McNaul's back pay claim should be limited and his front pay claim should be eliminated solely on statements and information contained in McNaul's applications for long term disability insurance and social security disability insurance. Because McNaul's social security disability and long term disability insurance statements do not state categorically that he could not work at all or take into account his entitlement to reasonable accommodations, there is no inconsistency between those statements and his claim for back and

14

front pay in this case.  Turner v. Hershey Chocolate USA, 440 F.3d 604, 608-10 (3rd Cir. 2006).

Additionally, McNaul believes that if he was not fired, he would not have suffered such a major

depression and he could have worked, with accommodation, for at least another several years.  If

the employer's conduct caused the employee to be unable to work due to being disabled, then the

period he is disabled should not be excluded from his back pay.  Johnson v. Spencer Press of

Maine, Inc., 364 F.3d 368, 383-384 (1st Cir. 2004).

## V.     CONCLUSION AND REQUEST FOR ORAL ARGUMENT

For the foregoing reasons, McNaul respectfully requests that this Court deny Defendant's

Motion for Summary Judgment.  McNaul's counsel respectfully requests oral argument.

Respectfully submitted,

By: _____SMP2861_____
Scott M. Pollins (Pa. Atty. Id. No. 76334)
108 Springton Mews Circle
Media, PA 19063-1070
(610) 896-9909 (phone)
(610) 896-9910 (fax)
scott@pollinslaw.com (email)

Date:  4/12/10_____

Attorney for Plaintiff, Michael R. McNaul

## <u>CERTIFICATE OF SERVICE</u>

I, Scott M. Pollins, certify that I served Plaintiff's Response to Defendant's Motion for

Summary Judgment via the Court's ECF system on April 12, 2010 upon Defendant's counsel

addressed as follows:


Michael D. Kristofco, Esquire
**Wisler, Pearlstine, LLP**
484 Norristown Road, Suite 100
Blue Bell, PA 19422-2326
mkristofco@wispearl.com (email)


SMP2861
Scott M. Pollins